UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

      v.

STEVEN M. BOLLA, WASHINGTON
INVESTMENT NETWORK, SUSAN
BOLLA, and ROBERT RADANO,

    Defendants.

Civil Action No. 02-1506  (CKK)

**MEMORANDUM OPINION**
(September 22, 2005)

Plaintiff Securities and Exchange Commission ("SEC") filed this civil enforcement

action on July 31, 2002, alleging various violations of the federal securities laws by Defendants

Steven Bolla, Washington Investment Network ("WIN"), Susan Bolla, and Robert Radano.  After

the SEC reached a settlement in principle with Defendants Steven and Susan Bolla,[1] a bench trial

occurred before this Court on July 26-28, 2004, during which the Court heard testimony relating

to the allegations against the remaining Defendants, WIN and Robert Radano.  WIN is charged

with a primary violation of Sections 203(f), 206(1), and 206(2) of the Investment Advisers Act of

1940 ("Advisers Act"), while Mr. Radano is charged with aiding and abetting WIN's alleged

violations.  This Memorandum Opinion details the Court's findings of fact and conclusions of

law, as required by Federal Rule of Civil Procedure 52(a).  *See* Fed. R. Civ. P. 52(a) ("In all

---

[1] Defendant Steven Bolla was charged with violations of Section 17(a) of the Securities
Act of 1933, Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 and Rule 10b-5
thereunder, and Sections 203(f), 206(1), and 206(2) of the Investment Advisers Act of 1940.

actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon").

Based upon the credible evidence adduced at trial and all reasonable inferences to be drawn from the testimony of the witnesses and the documentary evidence in the case, the Court concludes that Defendants WIN and Robert Radano violated Sections 203(f), 206(1), and 206(2) of the Advisers Act.  As such, pursuant to Federal Rule of Civil Procedure 58, the Court shall enter judgment in favor of the SEC, shall issue injunctions barring Defendants from future violations of these provisions, and shall impose a civil money penalty fine of $15,000 against Mr. Radano and a civil money penalty fine of $50,000 against WIN.

## I: PRELIMINARY FINDINGS OF FACT

### *Background*

1.  Defendant WIN is an investment adviser located in Bethesda, Maryland.  Pl.'s Ex. 40, 42; Burdette Dep. 52:23-53:2; Radano Dep. at 13:16-14:4; Radano Investigative Test. 20:5-7; Trial Tr. at 44:17-18, 55:7-11, 55:21-56:4, 71:25-72:16, 97:21-98:4, 101:14-102:10, 106:12-107:1, 113:25-114:4, 119:12-19, 126:11-17, 131:19-24, 132:22-135:15, 136:5-12, 339:22-24, 379:18-21.  Since 1997, WIN has been a registered investment adviser operating as an investment consulting entity.  J. Pre-Tr. Stmt., Stipulation #1.  WIN is currently registered as an investment adviser in the State of Connecticut, Pl.'s Ex. 42, 53, 65-68, Trial Tr. 119:12-19, Radano Investigative Test. 83:22-84:14, 85:20-22, and was formerly registered as an investment adviser in the Commonwealth of Virginia, Pl.'s Ex. 40, 43, Radano Dep. at 19:3-11, Trial Tr. at 102:2-4.

2.  Defendant Robert Radano is also a resident of Bethesda, Maryland, Radano Dep. at

3:9-12; Trial Tr. 262:7-8, and has been an investment adviser registered with the State of

Connecticut since 1998, Pl.'s Ex. 42, 53, 65-68, Radano Dep. at 4:25-5:14; Trial Tr. 101:4-7,

119:12-19, 144:23-25, 262:23-24, 268:1-5.  Mr. Radano graduated from George Washington

University in 1977 with a B.A. in Political Science.  From 1977 through 1985, Mr. Radano

worked in various political positions, including as a congressional aide.  In 1985, he became a

Series 7 registered broker with Legg Mason in Washington, D.C.  From 1985 through 1997, Mr.

Radano worked in various Series 7 broker positions for Legg Mason; Shearson, Lehman and

Hutton; and Washington Investment.  In March 1997, Mr. Radano obtained his Series 65 and

became a registered investment adviser.  Radano Dep. at 4:4-20, 4:25-5:14.

### Steven Bolla and the Origin of the Business Relationship with Lockwood Financial

3.  In the late 1990s, Defendant Steven Bolla began working as an investment adviser

with Lockwood Financial Services, Inc. ("Lockwood"), a broker-dealer and registered investment

adviser that acted as a third-party administrator for a large group of highly regarded money

managers.  Bolla Dep. at 16:1-17[2]; Burdette Dep. at 6:10-14, 25:21-24; Radano Dep. at 11:10-

12:8; Trial Tr. at 276:9-15.  Formed in 1996 by former executives from Smith Barney, Lockwood

is based in Malvern, Pennsylvania, with branch offices across the country.  By the year 2000,

when events relevant to this case occurred, Lockwood had over $6 billion in assets under

management.  Burdette Dep. at 8:3-13, 9:8-15.

4.  Lockwood's business model was to serve as a nexus between investment advisers and

institutional money managers by offering an investment vehicle known as a "wrap" account.

---

[2] The Court shall refer to the deposition of Steven M. Bolla as "Bolla Dep.", and the
deposition of Susan Bolla as "Susan Bolla Dep." in its citations.

Trial Tr. at 277:9-19; Bolla Dep. at 16:1-17:2.  These "wrap" accounts allowed individual clients of Lockwood's affiliated investment advisers to pool their assets to meet the rather large minimum investment amounts required by Lockwood's institutional money managers.  Burdette Dep. at 9:20-24; Radano Dep. at 32:7-19; Trial Tr. at 277:9-19, 277:20-278:16.

5.  Lockwood had no sales force; rather, it attracted clients for its investment adviser business through arrangements with individual investment advisers who referred their client assets to Lockwood.  Bolla Dep. at 11:17-12:8; Trial Tr. at 276:9-277:8, 283:3-15.  Clients referred to Lockwood by an individual investment consultant entered into a separate contract with Lockwood, and became clients of Lockwood as well.  Bolla Dep. at 18:17-19:17; Burdette Dep. at 10:6-9, 61:18-62:14; Trial Tr. at 47:11-13, 71:8-18, 283:20-284:6; Pl.'s Ex. 19.

6.  Under Lockwood's "Managed Account Link" program, Lockwood handled all account administration and charged the client a single "wrap fee" for the overall management and servicing of the client's account, out of which Lockwood retained an "advisory fee" for itself and paid fees to the clearing agent (generally, Charles Schwab & Co.), the money managers, and the individual investment advisers, each of whom received fees based generally upon a percentage of the assets that the client had invested.  Bolla Dep. at 16:1-17:2, 24:21-25:7, 25:22-26:4; Burdette Dep. at 15:4-17:25; Trial Tr. at 277:2-280:24; Pl.'s Ex. 22, 23-30; Defs.' Ex. J, K.

7.  Each individual investment adviser who referred clients to Lockwood was given a unique four-letter "rep code" to record the source of the client referral and also to determine to whom the consultant fee payments should be remitted.  Burdette Dep. at 13:5-11, 14:11-15:16.  Mr. Bolla was assigned the rep code "OFAA."  Bolla Dep. at 24:6-11; Burdette Dep. at 12:19-13:4, 27:11-20.

### *Bolla, Robert Radano, and the Creation of WIN*

8.  Defendant Robert Radano, who knew Mr. Bolla professionally from their prior broker-dealer work, was attracted to the Lockwood model; however, unlike Mr. Bolla, Mr. Radano did not have any client assets that he was in a position to refer to Lockwood, nor was Mr. Radano at that time licensed as an investment adviser.  Trial Tr. at 263:20-264:25; 270:2-271:19, 287:24-288:23.  Despite his lack of client assets, Mr. Radano believed that he would eventually build a referral business by soliciting certified public accountants ("CPAs") in the Washington, D.C., area and agreeing to share the Lockwood referral fees with the CPAs whose clients chose to invest assets through Lockwood.  Trial Tr. at 281:282:24.

9.  Upon reaching a mutual understanding, Messrs. Bolla and Radano decided to form WIN as a vehicle through which they could work as individual investment advisers with Lockwood, with each person receiving his share of the Lockwood consultant fees attributable to his efforts.  Radano Dep. at 32:25-34:5, 37:12-23, 38:7-17, 41:10-42:3, 43:79; Bolla Dep. at 19:14-20:8; Trial Tr. at 274:16-275:10, 283:20-284:9, 285:15-286:9.  In addition to the client investments with the Lockwood institutional money managers, WIN clients also invested with Mount Lucas Management ("MLM"), an independent money manager.  Pl.'s Ex. 48, 49; Bolla Dep. at 35:21-36:10, 100:1-5; Radano Dep. at 54:2-55:7; Trial Tr. at 411:9-412:25.  MLM was initially a money manager option for clients through Lockwood but when MLM and Lockwood disassociated, some clients of Mr. Bolla and Mr. Radano retained their investments there, and MLM sent payments for the consultant fee component of those accounts directly to WIN.  *Id.*

10.  In 1999, WIN registered as an investment adviser in the Commonwealth of Virginia.  Pl.'s Ex. 43; Radano Dep. at 19:13-21; Trial Tr. at 101:25-102:4.  In June 2000, the State of

Connecticut approved WIN's registration as an investment adviser in that state. Pl.'s Ex. 42; Trial Tr. at 102:5-10, 119:12-19. WIN received compensation for providing advice to its clients relating to securities investments. Pl.'s Ex. 22, 23-30; Defs.' Ex. J, K; Grotto Dep. at 25:24-26:11; Radano Dep. at 43:24-44:2; Trial Tr. at 286:10-17, 301:22-302:3. Lockwood and MLM deducted WIN's advisory fees from client accounts, and sent those fees via check to WIN. Pl.'s Ex. 22, 23-30, 47-49; Defs.' Ex. J, K; Burdette Dep. at 27:22-28:8, 39:4-12; Bolla Dep. at 25:22-26:4, 29:12-25, 36:5-10, 115:19-21; Investigative Test. 146:25-147:2, 148:3-12, 148:22-149:14, 244:21-245:7; Trial Tr. at 218:24-219:2. Client account forms designated WIN as the investment advisory firm, Pl.'s Ex. 3, 5, 19, 21, 60, 61, and WIN clients such as Nancy DeFelice and Karen Grotto considered WIN to be their investment adviser, Grotto Dep. at 10:6-12; Trial Tr. at 44:17-18, 55:7-11, 55:21-56:4, 71:25-72:16, 97:21-98:4.

11. When Mr. Radano and Mr. Bolla formed WIN, Mr. Radano knew that the SEC was investigating Mr. Bolla's conduct with respect to another investment advisory firm, Trustcap Financial Group ("Trustcap"). Radano Dep. at 7:13-8-:18, 9:2-11; Trial Tr. at 272:15-22; J. Pre-Tr. Stmt., Stipulation #2. Trustcap, and Mr. Bolla's association with that entity, entirely pre-dated the creation of WIN, and had no relationship to either WIN or Mr. Radano. J. Pre-Tr. Stmt., Stipulation #3. Messrs. Radano and Bolla believed that the SEC's investigation into Trustcap would lead, in all likelihood, to the SEC barring Mr. Bolla from being associated with any investment adviser. Radano Dep. at 59:7-11; Investigative Test. at 161:8-16, 169:20-170:3. Because Mr. Radano and Mr. Bolla were concerned about potential SEC action against Mr. Bolla relating to the Trustcap matter, they agreed not to name Steven Bolla as an owner of WIN. Bolla Dep. at 9:9-10:1; Radano Dep. at 13:4-11; Investigative Test. at 63:21-64:1, 66:23-67:5, 81:3-8;

Trial Tr. at 124:24-125:3, 294:24-295:2.

12.   Instead, Mr. Bolla and Mr. Radano agreed to place the ownership of WIN in the names of Mr. Radano and Susan Bolla, Mr. Bolla's wife.  Pl.'s Ex. 52; Bolla Dep. at 8:20-23, 10:11-16; Radano Dep. at 12:25-13:3; Investigative Test. at 63:20-22; Trial Tr. at 110:10-22, 124:24-125:3, 294:24-295:2, 296:10-12.  The ownership of the company was set up in this manner based upon the advice of counsel.  Bolla Dep. at 10:11-14; Trial Tr. at 294:12-296:9.  At that time, Mrs. Bolla had no experience in the securities industry.  Investigative Test. at 68:13-22.  Indeed, during the time period relevant to this case, Mrs. Bolla never acted as an investment adviser, nor did she ever discuss any substantive issues with WIN clients.  Bolla Dep. at 8:10-15, 11:17-21:11; Susan Bolla Dep. at 10:3-11:11, 13:21-14:6; Radano Dep. at 17:6-16, 163:7-11; Investigative Tr. at 21:12-17, 67:16-24, 214:2-8; Trial Tr. at 66:22-23; Defs.' Proposed Findings of Fact ¶ 17.  At most, Mrs. Bolla would assist WIN on occasion with certain administrative duties, such as answering the phone, filing, or forwarding messages to Mr. Bolla.  Bolla Dep. at 11:17-13:1.  As such, from the time WIN began conducting business, Messrs. Bolla and Radano were the principals of WIN and effectively ran the firm.  Bolla Dep. at 8:3-5; Susan Bolla Dep. at 8:5-15; Investigative Test. at 63:11-18.

13.   Ownership in WIN never involved any equity interest.  WIN was not created or expected to build an equity interest for its owners; rather, WIN was merely a pass-through for the payment of Lockwood and MLM advisory fees earned by Mr. Bolla and Mr. Radano.  Trial Tr. at 291:14-292:20.

14.   After forming WIN, Mr. Radano became licensed as an investment adviser and submitted his own "rep code" application to work with Lockwood as an individual investment

adviser.  Pl.'s Ex. 17; Radano Dep. at 87:6-88:5.  In addition, both Mr. Radano and Mr. Bolla

established WIN checking accounts.  Pl.'s Ex. 47; Defs.' Ex. 1; Radano Dep. at 143:1-144:12;

Trial Tr. at 303:10-17, 304:11-17, 305:1-7.  However, Mr. Bolla was responsible for WIN's

finances: he deposited WIN's fees from Lockwood and MLM in the WIN checking account that

he established, Pl.'s Ex. 1, 22, 47; Defs.' Ex. N; Bolla Dep. at 89:10-90:2; Investigative Test. at

246:8-17, and made payments on behalf of WIN to Radano, himself, and third-parties, Pl.'s Ex.

47, 50; Bolla Dep. at 32:2-4, 32:13-17, 36:5-10, 122:22-123:3; Susan Bolla Dep. at 15:5-11;

Radano Dep. at 53:9-16, 103:13-104:8, 131:17-24; Trial Tr. at 304:8-10; J. Pre-Tr. Stmt.,

Stipulation #6-7.  Mr. Bolla used an account at PNC Bank in the name of "Steve M. Bolla d/b/a

Washington Investment Network," over which he had sole control and sole signatory authority,

to handle WIN's finances and cash flow.  J. Pre-Tr. Stmt., Stipulation # 6-7; Pl.'s Ex. 47; Defs.'

Ex. I.  Lockwood sent all client statements and fees, including those pertaining to Mr. Radano's

referrals, directly to Mr. Bolla at his home address.  Pl.'s Ex. 22; Defs.' Ex. J; Bolla Dep. at

23:11-24:11; Trial Tr. at 298:15-299:2, 301:21-302:6.  Mr. Bolla and Mr. Radano worked in

different locations and had only sporadic personal contact, as Mr. Bolla maintained an office in

his home in suburban Virginia, while Mr. Radano kept a small, shared rental suite office in

Bethesda.  Trial Tr. at 296:23-297:16.  Due to Mr. Bolla's control over WIN's finances, Mr.

Radano never saw originals or copies of the fee payment checks sent from Lockwood to Mr.

Bolla, nor did Mr. Radano see monthly client account statements for the clients that Mr. Bolla

had referred to Lockwood.  Trial Tr. at 298:9-300:20, 301:21-302:6, 305:13-15.

15. Mr. Bolla and Mr. Radano were held out as the face of WIN.  J. Pre-Tr. Stmt.,

Stipulation # 6-7; Pl.'s Ex. 47; Defs.' Ex. I; Trial Tr. at 48:6-9, 72:15-25 (Ms. DeFelice notes

that she considered Mr. Bolla and Mr. Radano "the face of WIN").  Moreover, clients were led to believe that Mr. Bolla – and not Mrs. Bolla – was a principal of the firm.  Trial Tr. at 45:1-7. While clients of WIN felt that they would interact with a particular individual at WIN, they felt that they were investing with the company itself – not a particular individual.  Trial Tr. at 48:3-5 (Ms. DeFelice notes that "I expected this, the role of WIN, the entity to be like when you invest with a Merrill Lynch or a Paine Webber, whatever, that was the company").

16. By the summer of 2000, Mr. Radano had a handful of clients that generated roughly $10,000 per year in advisory fees to him – an amount he characterized as "very, very low." Defs.' Ex. O; Trial Tr. at 302:10-21.  In contrast, Mr. Bolla referred approximately $30-40 million in client assets to Lockwood, garnering him roughly $150,000 per year in advisory fees. Defs.' Ex. O; Trial Tr. at 302:22-303:7.

### June 2000 – The SEC Bars Bolla From Associating With Any Investment Adviser

17. The expectation that the SEC would bar Mr. Bolla from associating with any investment adviser as a result of the Trustcap investigation was ultimately fulfilled in 2000.  Pl.'s Ex. 58; Bolla Dep. at 36:24-37:14; Radano Dep. at 58:11-23; Trial Tr. at 318:18-20.  In January or February 2000, Mr. Bolla told Mr. Radano that the SEC had decided to bar him.  Radano Dep. at 93:12-24; Trial Tr. at 115:15-23, 137:1-10, 138:7-13; Defs.' Proposed Findings of Fact ¶ 30. On March 20, 2000, as part of a settlement with the SEC in the Trustcap matter, Mr. Bolla signed his consent to the imposition of the bar.  Pl.'s Ex. 56; Bolla Dep. at 37:20-38:7.  On June 19, 2000, the Hon. Thomas Flannery of the United States District Court for the District of Columbia issued a judgment enjoining Mr. Bolla from violating the anti-fraud and other provisions of the Investment Advisers Act of 1940, the Securities Act of 1933, and the Securities Exchange Act of

1934, and imposed on him a $10,000 penalty.  Pl.'s Ex. 57; Bolla Dep. at 38:13-25.  On June 20,

2000, the SEC issued an Order barring Mr. Bolla from associating with any investment adviser,

with the right to reapply for association after five (5) years from the date of entry.  Pl.'s Ex. 58;

Bolla Dep. at 38:13-25; J. Pre-Tr. Stmt., Ex. 4.  There is no evidence that Mr. Radano, after

being informed in early 2000 of Mr. Bolla's upcoming bar, took any action to prepare for the

imposition of that bar before June 20, 2000.  Radano Dep. at 93:25-94:13; 171:2-9, 172:18-22.

In his testimony before the SEC, Mr. Radano claimed that he did not talk further with Mr. Bolla

about the upcoming bar because he believed that the entire transition would simply be a matter of

one phone call to Lockwood.  Investigative Test. at 171:2-17.

     18.  Shortly before his bar, Mr. and Mrs. Bolla relocated from Centreville, Virginia, to

Alpharetta, Georgia, on June 16, 2000.  Bolla Dep. at 43:23-25; Trial Tr. at 154:20-33.

     19.  Mr. Radano learned of the imposition of the bar against Mr. Bolla within a day or so

after it was issued, from a representative of Charles Schwab, a clearing agent and custodian for

Lockwood accounts, who called WIN to say that Mr. Bolla would be unable to act as an

investment adviser vis-á-vis Lockwood customers whose accounts were held in custody by

Schwab.  Radano Dep. at 58:24-59:6; Investigative Test. 34:3-7, 52:25-53:3, 156:9-20, 157:20-

23; Trial Tr. at 318:18-319:3.  Mrs. Bolla also learned that the SEC had barred Mr. Bolla from

associating with WIN, as an investment adviser, shortly after the imposition of the bar.  Susan

Bolla Dep. at 18:12-20.

     20.  Mr. Radano testified that he immediately called Mr. Bolla and stated that for any

Lockwood clients still a part of WIN, all records needed to be sent to Mr. Radano.  Bolla Dep. at

35:10-20, 47:5-25; Trial Tr. at 321:21-323:2.  Moreover, during the period immediately

following Mr. Bolla's bar, i.e., roughly July 2000, Mr. Radano testified that he and the Bollas

agreed that Susan Bolla's nominal ownership was terminated.  Susan Bolla Dep. at 44:4-12

(noting that "I thought it was all dissolved"); Trial Tr. at 312:5-317:6.  Mr. Radano produced a

memorandum dated July 10, 2000, that purported to memorialize his and Mrs. Bolla's agreement

regarding the abrogation of her ownership interest in the firm.  Pl.'s Ex. 52.  However, Mr.

Radano's claim that Mrs. Bolla's nominal ownership was terminated during this period is

contradicted in four ways.  First, the only evidence provided by Mr. Radano supporting the

transmission of the alleged July 10, 2000 agreement was a June 12, 2001 facsimile header

reflecting that Mr. Radano had sent the memorandum to the Bolla's new home in Georgia.  Pl.'s

Ex. 52; Susan Bolla Dep. at 15:22-16:2 (Mrs. Bolla testified that she had never seen the

memorandum prior to her deposition), 19:14-24 (Mrs. Bolla noted that she had never discussed

the contents of the memorandum with Mr. Radano); Trial Tr. at 315:18-25.  Second, despite

knowledge of Mr. Bolla's impending bar, Mr. Radano registered Mrs. Bolla as a WIN investment

adviser in the State of Connecticut in March 2000.  Pl.'s Ex. 53; Trial Tr. at 121:22-24.  In

December 2000, Mr. Radano renewed Mrs. Bolla's registration in Connecticut as a WIN

investment adviser for the 2001 calendar year.  Pl.'s Ex. 53, 66; Trial Tr. at 241:9-19.  Third, in

February 2001, Mr. Radano wrote a check payable to Mrs. Bolla for $2,770 from client fees

generated in the first quarter of 2001.  Pl.'s Ex. 50; Radano Dep. at 162:15-20; Bolla Dep. at

65:6-66:7, 66:24-67:11, 118:17-25; Investigative Test. at 117:20-24, 139:17-25; Trial Tr. at

439:12-440:10.  Fourth, in April 2001, Mr. Radano admittedly told staff from the SEC's Office

of Compliance Inspections and Examinations that Mrs. Bolla was a current owner of WIN.

Stipulation, J. Ex. 1.  Given these glaring contradictions vis-á-vis Mr. Radano's claim, the Court

concludes it is more likely than not that the purported July 10, 2000 agreement was drafted after the fact, and that Mr. Radano did not formally move to abrogate Mrs. Bolla's ownership interest in WIN until the date of the June 12, 2001 facsimile.

21.  Mr. Radano testified that he hoped to take over Mr. Bolla's accounts, although he was skeptical that the accounts would stay with him after their transitioning because he did not know most of the clients or CPAs with whom Mr. Bolla did business and had never shared in any of Mr. Bolla's substantial fees from that business; as such, he expected that Mr. Bolla would sell or transfer this very valuable book of business to another party.  Trial Tr. at 308:5-312:4. Moreover, Mr. Radano testified that he was "petrified" that he would lose the ability to access Lockwood as a result of Mr. Bolla's bar and Lockwood's reaction to it.  Trial Tr. at 209:10-14, 361:6-9.

### The Events Subsequent to Mr. Bolla's Bar: Notifying Outside Parties or Business as Usual?

-  <u>Mr. Radano's Contacts With Lockwood</u>

22.  Upon learning of Mr. Bolla's bar, Mr. Radano called Lockwood and – after a series of transfers – spoke with James Burdette, Lockwood's broker-dealer president and its director of compliance.  Burdette Dep. at 5:19-24; Trial Tr. at 323:3-324:3, 336:4-9.  During this phone conversation, Mr. Radano informed Mr. Burdette of the SEC's bar of Mr. Bolla.  Burdette Dep. at 28:9-19.  The exact timing of this phone conversation is somewhat in dispute: Mr. Burdette initially told SEC staff that Mr. Radano had called him "around June 30, 2000" to inform him of Mr. Bolla's bar, J. Pre-Tr. Stmt., Stipulation #7; Burdette Dep. at 83:8-84:20; Burdette SEC Test. at154:18-24; however, Mr. Burdette later disavowed his first statement to the Commission, and –

during his sworn testimony before the SEC during the investigation into Mr. Bolla's activities

following his bar – asserted that he had not been called by Mr. Radano until late July or August

2000, Burdette SEC Test. at 154:18-24; during his deposition in this case following his sworn

testimony before the SEC, Mr. Burdette testified that Mr. Radano did not call him until the latter

part of August 2000, Burdette Dep. at 28:9-19.  Regardless of the exact timing of this phone call,

which occurred by the end of August 2000 at the latest, Mr. Burdette testified that but for Mr.

Radano informing Lockwood of Mr. Bolla's bar, Lockwood would not have ever known about

Mr. Bolla's bar given the existing state of its compliance systems.  Burdette Dep. at 21:6-13.

23.   During this phone call, Mr. Radano requested that all client account statements,

communications, and fee payments for all WIN-referred client accounts at Lockwood be

thereafter re-routed to him rather than Mr. Bolla.  Burdette Dep. at 29:16-30:8.  Despite Mr.

Radano's request, Lockwood refused to recognize Mr. Radano's authority to act vis-á-vis WIN

client accounts – even those accounts referred by Mr. Radano himself – as Lockwood viewed the

"WIN" client accounts as Mr. Bolla's accounts and saw Mr. Radano merely as "an administrative

support person" to Mr. Bolla.  Pl.'s Ex. 44; Burdette Dep. at 27:11-20.  Mr. Burdette informed

Mr. Radano that Lockwood would not re-route the client statements and fee payments without a

written letter of authorization ("LOA") switching each client's individual investment adviser

from Mr. Bolla to Mr. Radano.  Pl.'s Ex. 44; Burdette Dep. at 29:25-30:15.

24.  Lockwood also took the further step of affirmatively discontinuing Mr. Radano's

pass-code access to Lockwood's internet-based account system.  As such, Mr. Radano's access to

information regarding the Lockwood client accounts referred by WIN – both by Mr. Bolla and

himself – was terminated.  Trial Tr. at 349:1-10.  Having been told by Mr. Burdette that he had

no "rep code" at Lockwood because his 1999 application had not been fully approved at that time, Mr. Radano resubmitted his earlier application that he believed had been approved. Burdette Dep. at 32:12-33:7; Trial Tr. at 350:13-351:10, 352:4-353:1.

25.   According to his testimony, subsequent to this conversation with Mr. Burdette, Mr. Radano immediately contacted the individuals he considered to be his clients in the WIN business and informed them of Mr. Bolla's disciplinary bar and transition out of WIN.  Trial Tr. at 356:17-357:2.  Mr. Radano had obtained the contact information for his clients around June 2000, when he visited the Mr. Bolla's home and collected a series of boxes with the WIN-referred account information of his clients.  Trial Tr. at 3-15.  Mr. Radano testified that during this visit, he did not obtain contact information for Mr. Bolla's WIN clients, necessitating his reliance on Lockwood to provide him the relevant contact information.  *Id.*

26.   Also subsequent to his conversation with Mr. Burdette, Mr. Radano sought to obtain LOA's from WIN's clients so that he could gain access to their information and fee payments. Trial Tr. at 383:4-8.  On October 4, 2000, Mr. Burdette drafted a letter to Mr. Radano in order to clarify the necessary documents that Mr. Radano would need in order for Lockwood to treat him as the "adviser" on the client accounts.  Pl.'s Ex. 44.  Mr. Burdette wrote:

> A Letter of Authorization is required from each client naming you as the new advisor on the account.
>
> \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*
>
> LOAs to change the Advisor must be received by October 31, 2000 by Lockwood in order for you to be paid for the 4th quarter.  You will not be paid for any account that an LOA has not been received and the consultant fee will be credited back to client accounts.  *In addition, for any accounts that an LOA has not been received by October 31, 2000, Lockwood will contact the clients directly.*  It is Lockwood's responsibility as a fiduciary and B/D of record to inform any client

14

who has not yet signed a change of advisor LOA that their account is currently
being held in a Lockwood house rep number due to Steve Bolla's no longer being
Investment Advisory licensed.  They will be instructed that Lockwood does not
take accounts directly and that they must choose a new advisor.

*Id.* (emphasis added).

27.  Mr. Radano asserts that "[u]ntil Lockwood made these client transfers in its system,
[he] had no access to client contact information for most of the former Bolla clients of Lockwood
and no authorization from Lockwood to contact those clients or to receive Lockwood client
statements or fee payments related to those client accounts." Defs.' Proposed Findings of Fact ¶
48; Trial Tr. at 168:18-169:3 (claiming that Lockwood affirmatively prohibited him from
contacting WIN clients).  A plain reading of the October 4, 2000 letter from Mr. Burdette is
contradictory on this matter, as it indicates that if Mr. Radano <u>failed</u> to obtain LOAs from WIN's
clients by October 31, 2000 – over four months after Mr. Radano had first learned of Mr. Bolla's
bar – *at that point*, Lockwood would contact those clients.  As such, the October 4, 2000 letter
indicates an understanding by Lockwood that (1) Mr. Radano would be contacting WIN's clients,
and that it would only act as the fail-safe contact for those clients in the event that he failed to do
so by October 31, 2000; and (2) Mr. Radano would be able to contact WIN's clients and obtain
letters of authorization from all of its clients without Lockwood providing him affirmative access
to their records containing the contact information.  *See* Pl.'s Ex. 44.  Lockwood never contacted
any of the clients at issue to inform them of Mr. Bolla's disciplinary status or to ask the client to
choose a new adviser.  Burnette Dep. at 66:7-16.  There is nothing in the letter to support
Defendant's view that he could not contact WIN clients at any time.

28.  LOAs for Mr. Radano's WIN clients were executed and forwarded to Lockwood at

the end of October 2000.  Pl.'s Ex. 45, 46; Trial Tr. at 463:20-464:15.  Lockwood eventually

switched many clients that had been referred by Mr. Bolla over to Mr. Radano as the investment

adviser of record in the Lockwood system, apparently even without signed LOAs.  Defs.' Ex. J;

Trial Tr. at 398:10-399:6.  Lockwood reinitiated Mr. Radano's pass-code access to its website on

November 13, 2000.  Defs.' Ex. F.

- <u>Mr. Bolla Post-Bar's Actions, and His Dealings With Mr. Radano</u>

29.   For nine months following the SEC's imposition of the "bar order," from June 2000

to March 2001, Mr. Bolla continued to manage WIN's finances by depositing fee checks in the

WIN checking account at PNC Bank and by making – or directing Mr. Radano to make –

payments to third-parties on behalf of the firm.  Pl.'s Ex. 47; Bolla Dep. at 33:2-35:2, 54:22-

55:17, 56:18-58:11, 59:6-18, 61:1-10, 62:7-17, 63:1-22, 64:23-65:5, 97:24-98:14, 98:24-99:4,

99:10-10, 101:5-102:10, 102:16-103:17, 104:1-16, 105:16, 106:4, 106:16-107:1, 110:5-12,

111:16-113:6; Investigative Test. 254:11-255:9, 256:1-12, 256:24-257:2, 257:24-258:11, 262:22-

264:10, 274:17-275:2; Radano Dep. at 130:2-24, 131:8-18, 133:5-134:10, 158:23-159:14.

30.   Mr. Bolla continued to provide investment advice to at least two WIN clients after

his bar, acting as WIN investment adviser to Nancy DeFelice for ten (10) months and to David

Meredith – WIN's largest account – for four (4) months.  Pl.'s Ex. 60-62; Grotto Dep. at 13:14-

14:8, 17:24-18:3, 18:24-19:12, 19:18-20:16, 23:8-24:17, 32:25-33:18, 65:8-17; Trial Tr. at

53:24-54:5, 55:10-13, 57:11-16, 57:17-58:8, 59:2-20, 64:23-65:16, 70:2-10, 75:3-8, 76:1-3.  Mr.

Radano was aware that Mr. Bolla continued to have a role in the DeFelice and Meredith accounts

at WIN after the imposition of his bar.  Grotto Dep. at 23:8-24:17; Radano Dep. at 202:22-

203:21; Trial Tr. at 82:21-25, 88:7-14, 97:6-12, 164:5-8, 175:13-16, 180:14-17, 398:2-4.

31.  Following the SEC's imposition of the bar order, Mr. Bolla also continued to act as the WIN point of contact for other firm clients.  He received calls and requests from numerous WIN clients, and instructed Mr. Radano to act on those requests.  Bolla Dep. at 167:19-25; Radano Dep. at 116:9-117:9 (noting that Mr. Bolla directed that he make roughly a dozen phone calls); Investigative Test. at 58:19-21 ("He began by referring phone calls to me from what were formerly his clients."), 61:23-62:5, 103:18-104:4, 104:17-105:9, 108:16-109:13 (noting that a quarterly fee check of $20,000 was sent to Mr. Bolla in October, 2000, who then sent Mr. Radano a check of $2,800 despite Mr. Radano's request for the whole amount); Trial Tr. at 156:24-158:12 (Mr. Radano followed Mr. Bolla's instructions regarding a payment that Mr. Bolla directed him to make on behalf of WIN in November 2000), 261:2-7, 358:20-25 (Mr. Bolla directed Mr. Radano to make certain follow-up calls to WIN clients regarding their WIN accounts), 447:12-448:7.

32.  Despite his bar, Mr. Bolla retained control over his account at PNC Bank in the name of "Steve M. Bolla d/b/a Washington Investment Network"; as such, he continued to retain and deposit WIN payment checks received from Lockwood throughout the Fall of 2000.  Radano Dep. at 60:14-23, 63:21-64:16, 98:22-99:5, 101:17-102:8; Trial Tr. at 363:5-11.  Mr. Radano never contacted PNC Bank as part of an attempt to sever Mr. Bolla's control over WIN's finances.  Trial Tr. at 153:7-154:12.  Mr. Radano testified that he did not contact PNC Bank because "this PNC account was Steve Bolla's d/b/a account in his social security number that he opened.  He had sole control over it.  I was powerless to call PNC and tell them to shut this account down.  They would not have talked to me."  Trial Tr. at 153:21-25; *see also* Investigative Test. at 60:19-23, 61:23-62:5 (Radano testified that in June 2000, he asked Steven and Susan

Bolla to send him the checkbook for this account, and they replied that they would but did not follow through).

33.   In July, August, October, and November of 2000, Lockwood sent Mr. Bolla no fewer than six fee payment checks totalling more than $79,000, as well as client account statements. Defs.' Ex. J, M; J. Pre-Tr. Stmt., Stipulation #5; Burdette Dep. at 86:9-19; Bolla Dep. at 32:21-35:2, 56:18-57:7, 57:12-58:11, 59:6-18, 61:1-10, 62:7-12.   The checks and client statements sent by Lockwood to Mr. Bolla after the bar reflect not only that Lockwood continued to send WIN payments to Mr. Bolla for several months after it had been notified of his bar; indeed, Lockwood even affirmatively changed Mr. Bolla's address in its system from his Centreville, Virginia, address to his new Alpharetta, Georgia, address, with the change of address first appearing on the July 2000 statement with accompanying fee payment check.  Pl.'s Ex. 24, 25.  Mr. Radano protested by repeatedly objecting to Lockwood's actions in continuing to send consultant fee payment checks and account information to Mr. Bolla in light of his SEC bar.  Burdette Dep. at 28:20-29:15 (Mr. Burdette recalls that Mr. Radano stated, "Why are you sending the checks to Steve?  Steve's barred.  He can't even do business.").

34.   On Feburary 15, 2001, Mr. Radano received a check from Lockwood.  Trial Tr. at 439:7-10.  This was the first payment that Mr. Radano had directly received from Lockwood. Investigative Test. at 139:17-22.  Out of the proceeds from that check, Mr. Radano made a payment to Mrs. Susan Bolla of approximately $2,700.  Pl.'s Ex. 50; Trial Tr. at 439:12-16. According to Mr. Radano, he made the payment after a phone conversation with Mr. Bolla, wherein Mr. Bolla indicated that he "felt that Sue should be paid something" from the check. Trial Tr. at 439:17-20, 439:21-440:5 (Mr. Radano notes that he "didn't have an objection" to

paying the money to Mrs. Bolla, although he "didn't think she had done a lot" but ultimately

agreed with Mr. Bolla to link the amount back "to this fee referral subaccounting work that's

done with the quarterly check"); Radano Dep. at 166:4-9 (Mr. Radano admits the he didn't

"know specifically" what Mrs. Bolla was doing during this period; "[s]he did her general

administrative chores as she had during this time frame"); Bolla Dep. at 67:11-69:6, 123:15-25;

Investigative Test. at 117:20-24, 119:1-120:10 (Mr. Radano states that the payment reflected "a

smaller percentage" of "the quarterly fees that were generated from the accounts that Steven

Bolla brought in before he was barred," i.e., a "token amount for work done at that time") .  Mr.

Bolla testified that the check was to cover – in part – the moving expenses and some

administrative fees incurred by the Bollas during their move to Georgia.  Bolla Dep. at 65:6-69:6.

Mrs. Bolla had provided no investment advice to any WIN clients, Radano Dep. at 172:15-24,

176:7-20, and Mrs. Bolla had never previously been compensated by WIN, Investigative Test. at

284:21-286:25, 288:13-124, Trial Tr. at 158:19-159:9.  Mrs. Bolla further testified that she had

no responsibility for filing and keeping track of WIN paperwork, Susan Bolla Dep. at 10:19-22,

writing checks, Susan Bolla Dep. at 10:25-11:3, handling any of WIN's finances, Susan Bolla

Dep. at 13:21-23, or working on the "subaccounting" or other internal accounting, Susan Bolla

Dep. at 13:24-14:3, 15:5-11.  Mrs. Bolla also noted the she had never seen the monthly reports

from Lockwood, Susan Bolla Dep. at 27:6-11, or any checks coming to WIN, Susan Bolla Dep.

at 30:6-12; *see also id.* at 39:11-16 (Mrs. Bolla never received this payment, and did not believe

that she was paid anything in 2001).

- <u>Mr. Radano's Conversations With Certain WIN Clients</u>

35.  Neither Mr. Bolla nor Mrs. Bolla ever disclosed Mr. Bolla's disciplinary history to

any WIN clients.  Bolla Dep. at 45:5-8, 47:13-15, 54:6-17; Susan Bolla Dep. at 26:1-4; Trial Tr.

at 66:9-11.  Mr. Bolla never sent his WIN clients a letter saying that he was leaving WIN; he

simply stopped communicating with them.  Investigative Test. at 167:19-24; Bolla Dep. at 54:6-

17 (recalling, at most, one phone call with a client – Tim Reardon – telling him to get in touch

with Mr. Radano).

36.  As noted previously, during the period following Mr. Bolla's bar, in roughly the Fall

of 2000, Mr. Bolla referred some of his WIN clients to Mr. Radano; these clients typically

contacted Mr. Radano telephonically after the referral.  Radano Dep. at 116:9-117:9 (noting that

Mr. Bolla directed that he make roughly a dozen phone calls); Investigative Test. at 58:19-21

("He began by referring phone calls to me from what were formerly his clients."); Trial Tr. at

163:20-22.  Mr. Radano told *some*, but not all, of these referred clients, Trial Tr. at 163:23-164:8,

that Mr. Bolla was "out of the business" and no longer with WIN due to the fact that "[h]e had

gotten into trouble at the SEC in an unrelated matter to WIN and to client accounts," Trial Tr. at

165:3-9, 166:2-19.  Mr. Radano also informed these referred clients that he "was working on

getting control of all of [Mr. Bolla's] accounts."  Trial Tr. at 165:8-9.  In these conversations, Mr.

Radano did not use the term "bar," and did not specifically tell the referred clients that Mr. Bolla

"was prohibited from being an investment adviser."  Trial Tr. at 164:9-167:6.  Primarily, if a

client called in, Mr. Radano "would have a discussion with them about their account

relationship."  Trial Tr. at 164:2-3.

37.  Although Mr. Radano knew that Mr. Bolla was continuing to advise WIN client

David Meredith, Grotto Dep. at 23:8-24:17, he did not disclose any aspect of Mr. Bolla's

disciplinary history to Karen Grotto, the daughter of Mr. Meredith and the day-to-day

administrator for the Meredith accounts.  Grotto Dep. at 25:3-9, 31:24-32:12; Radano Dep. at 73:10-24.  During October 2000, after experiencing trouble contacting Mr. Bolla, Ms. Grotto contacted Mr. Radano to inquire as to Mr. Bolla's availability; Mr. Radano told Ms. Grotto that Mr. Bolla was "out of the office."  Grotto Dep. at 32:5-12.  Later in the conversation, Mr. Radano simply informed Ms. Grotto that "'he's [Mr. Bolla] moved on,'" but did not tell her where Mr. Bolla had moved.  *Id.* at 44:4-11.  At no point during the course of Ms. Grotto's conversations with Mr. Radano did he ever mention that Mr. Bolla had been barred by the SEC from acting as an investment adviser.  *Id.* at 31:24-32:12.  This was the first discussion that Mr. Radano had with Ms. Grotto and, at that time, Ms. Grotto was not Mr. Radano's client.  Trial Tr. at 384:21-23, 386:25-388:4.

38.  During Ms. Grotto's call, she inquired about a concentrated block of stock that her family had in Packard Bioscience, which had nothing to do with the Lockwood accounts or WIN.  Trial Tr. at 388:5-389:1.  After the conversation with Ms. Grotto, Mr. Radano called Packard Bioscience and obtained information about the company.  After learning that Merrill Lynch was providing guidance to Packard Bioscience, he called Merrill Lynch, found a contact there who specifically knew the venture capitalists and research analysts covering the stock, and discussed Ms. Grotto's situation with the contact.  Subsequently, Mr. Radano called Ms. Grotto to give her contact information of the individual at Merrill Lynch, told her to immediately contact that individual, and notified her that there was no longer a need for his involvement in this process.  Trial Tr. at 389:25-392:12.  While Mr. Radano was not referring all of the Meredith accounts to Merrill Lynch, ultimately Ms. Grotto transferred all of the family's accounts – including the business that they had with Lockwood – to Merrill Lynch.  Mr. Radano never made "one dime"

off of the account of Ms. Grotto's family.  Trial Tr. at 392:13-394:4.  At trial, Mr. Radano

testified that he did not inform Ms. Grotto of Mr. Bolla's bar at this time because (1) Ms. Grotto

was not his client, Trial Tr. at 387:21-388:4, and (2) he had received instructions from Mr.

Burdette in June 2000 not to contact any of Mr. Bolla's clients, Trial Tr. at 389:2-14.  *See* Defs.'

Proposed Findings of Fact ¶ 55.  This is not corroborated by Mr. Burdette.  Therefore, the Court

does not credit Mr. Radano, particularly in light of the October 4, 2000 letter from Mr. Burdette.

39.  Mr Radano had a similar conversation in April or May 2001 with another WIN

investor that had initially been a client of Mr. Bolla, Ms. Nancy DeFelice; as with Ms. Grotto,

Mr. Radano was aware that Mr. Bolla continued to advise Ms. DeFelice after his bar.  Radano

Dep. at 202:22-203:21; Trial Tr. at 82:21-25, 88:7-14, 97:6-12, 164:5-8, 175:13-16, 180:14-17,

398:2-4.

40.  Mr. Radano claims to have first attempted to contact Ms. DeFelice prior to this time

period, in mid-February 2001.  *See* Defs.' Proposed Finding of Fact ¶ 56.  According to Mr.

Radano, he received a fee detail report listing Ms. DeFelice, whose name he was surprised to see

because he did not think that any LOA had been submitted to change the account from Mr. Bolla

to Mr. Radano.  Prior to this transfer, Mr. Radano had never spoken with Ms. DeFelice.

According to Mr. Radano, after discovering the transfer, he attempted to contact her, could not

reach her, and left several voice mail messages requesting that she call him.  Trial Tr. at 420:14-

422:7.  Ms. DeFelice's testimony contradicts Mr. Radano's recollection in several ways.  First,

she testified that the switch from Mr. Bolla to Mr. Radano as her investment adviser actually

occurred in her November 2000 statement, which had a phone number and an address listed for

Mr. Radano in the place of Mr. Bolla.  Pl.'s Ex. 61, Trial Tr. at 74:2-23.  Ms. DeFelice did not

want to "be handed off" to Mr. Radano, with whom she had never had a conversation.  Trial Tr.

at 75:20-25.  Ms. DeFelice then contacted Mr. Bolla, who was difficult to track down; Mr. Bolla

then told her that "he would still be working with [her] and that he was still [her] investment

consultant."  Trial Tr. at 75:6-8.  Second, Ms. DeFelice did not recall getting one or more voice

mail messages from Mr. Radano during the late 2000 to early 2001 time period.  Trial Tr. at

75:14-19.

      41.  Ms. DeFelice did not discover that Mr. Bolla had been barred from acting as an

investment adviser until the Spring of 2001, when she was contacted telephonically by the SEC.

Trial Tr. at 61:12-62:2.  After the phone call with the SEC, Ms. DeFelice spoke with her attorney

and then contacted Mr. Radano.  Trial Tr. at 62:10-21, 420:14-422:7.  Ms. DeFelice testified that,

during this conversation, she did not inform Mr. Radano that she was aware of Mr. Bolla's bar.

Trial Tr. at 63:3-6.  After Ms. DeFelice asked about Mr. Bolla, Mr. Radano informed her that

"Steve was going to pursue more of the insurance angle of the business."  Trial Tr. at 63:3-6,

63:7-10 (for Ms. DeFelice, this meant "Steve's still doing his investments, because [she] had

done a whole investment strategy with Steve around life insurance and Steve had told [her] that it

was one of his investment strategies").  After Ms. DeFelice asked him, "Are you aware that Mr.

Bolla is being investigated by the SEC?," Mr. Radano informed her that "a company in

California had gone bankrupt and Steve had information around that company and that was what

the SEC was investigating, and that WIN was not under investigation and, you know, offered to

help me and told me I didn't need a lawyer.  And that was basically it."  Trial Tr. at 63:11-17,

63:18-21 (noting that Mr. Radano never disclosed any aspects of Mr. Bolla's disciplinary history

to her during that call or at any other time), 64:15-19 (detailing that Mr. Radano gave her the

impression "Yeah, it's not a big deal.  We're not under investigation.  It's to do with this

company in California and its bankruptcy.").  After this conversation, Ms. DeFelice still believed

that Mr. Bolla was working with WIN.  Trial Tr. at 83:23-84:5, 86:13-23, 88:10-14 (noting that

she was "pressing for this information" because "[t]his was not given voluntarily to me").  Due to

concerns about the trustworthiness of Mr. Bolla and WIN, Ms. DeFelice then made the decision

to transfer all of her money away from WIN.  Trial Tr. at 64:5-14.

     42.  Mr. Radano's recollection of the Spring 2001 conversation with Ms. DeFelice differs

in some respects.  Mr. Radano emphasizes that – at the point of the phone call – Ms. DeFelice

already knew of Mr. Bolla's bar.  Trial Tr. at 61:12-63:17, 72:20-23.  According to Mr. Radano,

Ms. DeFelice was "edgy," and asked him "a series of questions in rather rapid order" regarding

her account and where Mr. Bolla was at that time.  Trial Tr. at 430:8-22.  Mr. Radano claims that

he "informed Ms. DeFelice that Mr. Bolla had left WIN and that he was with another firm."

Defs.' Proposed Findings of Fact ¶ 56; Trial Tr. at 435:11-14.  Mr. Radano testified that he then

tried to "assure her that her account was being handled properly."  Trial Tr. at 431:4-10.  Mr.

Radano then claimed that Ms. DeFelice actually "jumped in and told me. . . . Well, [Mr. Bolla

has] been barred."  Trial Tr. at 435:11-14.  According to Mr. Radano, he then acknowledged that

Mr. Bolla had been barred, and then "went into my 'Steve had a problem with another firm.  It's

unrelated to your situation here.  And he's no longer with WIN.  He's working with a firm in

California.'  I went into the basic lines."  Trial Tr. at 435:15-19.  Mr. Radano further notes that

Ms. DeFelice testified that she never received any notification of Mr. Bolla's SEC bar from

Lockwood.  Trial Tr. at 77:20-78:4.

     43.  To the extent that their testimony conflicts with that provided by Mr. Radano, the

Court – having witnessed the demeanor of the witnesses and having weighed their various motivations – credits the testimony of Ms. Grotto and Ms. DeFelice.  The Court finds that these two witnesses were clearly more credible than Mr. Radano whenever a conflict in their testimony arose.  The Court notes that these clients simply had more of a grievance with Mr. Bolla, who was their long-term contact at WIN, than with Mr. Radano.  The record does not reflect a claim of bias on their part.

## II: CONCLUSIONS OF LAW

By engaging in the conduct described above, the SEC asserts that Defendant WIN violated Sections 203(f), 206(1), and 206(2) of the Investment Advisers Act, *see* 15 U.S.C. § §80b-3(f), 80b-6(1) and (2), and Defendant Robert Radano aided and abetted those violations by WIN.  Section 209(d) of the Advisers Act gives the Commission the statutory authority to charge aiding and abetting violations in injunction actions such as the present one brought in United States District Courts.  To establish Defendant Radano's liability under an "aiding and abetting theory," the SEC must establish: (1) a primary or independent securities violation committed by another party; (2) awareness or knowledge by the alleged aider and abetter that his role was part of an overall activity that was improper; and (3) the alleged aider and abettor knowingly and substantially assisted the conduct that constitutes the primary violation.  *Investors Research Corp. v. Sec. & Exch. Comm'n*, 628 F.2d 168, 178 (D.C. Cir. 1980), *cert. denied*, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980) (citing *Woodward v. Metro. Bank of Dallas*, 522 F.2d 84, 94-97 (5th Cir. 1975)).  The SEC has the burden of proving each element of the aiding and abetting claims by a preponderance of the evidence.  *See Decker v. Sec. & Exch. Comm'n*, 631 F.2d 1380, 1388 (10th Cir. 1980).

In order to determine the potential culpability of WIN and Mr. Radano, the Court first shall examine whether WIN and Mr. Radano fall within the definition of "investment adviser" under Section 202(a)(11) of the Advisers Act. Because the Court concludes that WIN and Mr. Radano fall within the statutory definition of "investment adviser," the Court shall then analyze whether Defendants violated (1) Section 203(f), and (2) Section 206(1) and 206(2) of the Advisers Act. Finally, given the Court's finding of liability for the Defendants on these claims, the Court shall then weigh the need for the injunctive relief and/or civil fines as requested by the SEC.

### A.      The Parameters of the Definition of "Investment Adviser"

Defendants WIN and Robert Radano seek to escape liability as an initial matter by claiming that they fall outside of the statutory definition of "investment adviser," as defined in Section 202(a)(11) of the Advisers Act. According to Defendants, WIN and Mr. Radano were mere "consultants" to Lockwood, and therefore were not required to comply with the parameters of the Advisers Act. *See* Defs.' Proposed Findings of Fact ¶¶ 5, 13-14, 24-25, 45. Indeed, Defendants strenuously avoid the use of the word "adviser" throughout their entire Proposed Findings of Fact, preferring instead to label Mr. Bolla and Mr. Radano as "individual investment *consultants.*" *See, e.g.*, *id.* ¶ 5 (emphasis added). In support of this proposition, Defendants stress that "Lockwood, not WIN, had the custodial and contractual relationship with the clients at issue"; "Lockwood was the investment adviser and broker-dealer of record"; "Lockwood was the acknowledged fiduciary on the accounts"; and "WIN never acted as anything other than an investment consulting entity (and indeed, Lockwood did not even recognize WIN, but rather treated Bolla individually as the consultant)." Defs.' Response to Pl.'s Proposed Findings of Fact

26

at 2 (citing Defs.' Proposed Findings of Fact ¶¶ 5, 13-14, 24-25, 45).

Section 202(a)(11) of the Advisers Act provides, in relevant part:

An "investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or indirectly through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

15 U.S.C. § 80b-2(a)(11). The Supreme Court has concluded that "Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation enacted for the purpose of avoiding frauds, not technically and restrictively, but flexibly to effectuate its remedial purposes." *Sec. & Exch. Comm'n v. Capital Gains Research Bureau*, *Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (internal quotation marks omitted). As such, it has long been held that "persons who manage [] the funds of others for compensation are 'investment advisers' within the meaning of the statute." *Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977).

Upon a review, it is clear that the record is replete with indicia that WIN and Mr. Radano fall within the statutory definition of "investment adviser" and were bound in their dealings by the parameters of the Advisers Act. Before creating WIN along with Mr. Bolla, Mr. Radano obtained his Series 65 in March 1997 and became a registered investment adviser. As such, it can be inferred that he considered it a requirement that he be a registered "investment adviser" before conducting business under the WIN umbrella and engaging in a relationship with Lockwood. Moreover, in 1999, WIN registered as an investment adviser in the Commonwealth of Virginia, and was approved as an investment adviser by the State of Connecticut in June 2000. Client account forms designated WIN as the investment advisory firm, and WIN clients such as

Nancy DeFelice and Karen Grotto considered WIN to be their "investment adviser." *See, e.g.*,

Trial Tr. at 44:12-18 (Ms. DeFelice describes WIN as "an investment firm that manages clients'

money"). Indeed, Mrs. Bolla – one of WIN's principals – testified that the nature of WIN's

business was to "provide[] financial advice." Susan Bolla Dep. at 8:12-14. Moreover, WIN

received compensation for providing advice to its clients relating to securities investments:

Lockwood and MLM deducted WIN's advisory fees from client accounts, and sent those fees via

check to WIN.

In his deposition, Mr. Radano explicitly described the service provided by WIN as calling

for "investment planning, know your client issues, suitability issues, and then this allocation

model, and finally manager selection. But manager selection had to be with approved Lockwood

managers. So, in essence, our interaction would be to refer the client to Lockwood, and to refer

the client into managed account link program." Radano Dep. at 33:6-15. Once the WIN client

was set up with Lockwood, Mr. Radano and Mr. Bolla's role would shift: then, their

> primary duty was to monitor the account relationship, to look over the shoulder of
> the managers on an individual account basis, to make sure that the large cap value
> manager was indeed purchasing large cap value stocks, and that the account was
> consistent with what we thought were the plan and the parameters outlined by the
> client.

*Id.* at 37:16-23. If the account was no longer consistent with the client's goals, Mr. Bolla and

Mr. Radano were to ensure that "[c]hanges would be made in terms of management, in terms of

allocation between stock and bond." *Id.* at 42:1-3.

While there are certainly distinctions between the business model set up by Mr. Bolla and

Mr. Radano and that of investment advisers who have discretionary authority to trade in their

clients' accounts, Mr. Bolla and Mr. Radano were acting as investment advisers through WIN all

the same.  Importantly, their actions fell under the "persons who manage the funds of others" category set forth in *Abrahamson*.  With WIN, Mr. Bolla and Radano would obtain clients, acquire an awareness of their needs, and then select another manager of those funds; by selecting Lockwood and its system in every case, they were – in effect – channeling their clients' investment decisions for them.  Moreover, when an account was irregular, underperforming, or inconsistent with the stated goals, Messrs. Bolla and Radano would become involved and assist in making changes to the stock:bond allocation.  While not trading in their clients' accounts, Mr. Bolla and Mr. Radano were both (1) offering advice on how to best maximize return, i.e., by using them to move their money to the managers identified by Lockwood, and (2) actively managing their clients' accounts during signs of trouble.  In return for this service, they were provided oft-substantial compensation in the form of fees generated through the referral process. As such, Mr. Radano and WIN certainly fall within the statutory definition of an "investment adviser" under Section 202(a)(11) of the Advisers Act.

Defendants claim that Lockwood was the allegedly all-important "investment adviser of record" and "named fiduciary," Defs.' Proposed Findings of Fact ¶ 24, evinces a fundamental misunderstanding of the terms as applied.  Put simply, in this case each WIN client had three or four investment advisers: Mr. Radano and/or Mr. Bolla (depending on who received advisory fees for that client), WIN, and Lockwood.[3]  Contrary to Defendants' assertion, there was no one "fiduciary of record" for the WIN client accounts.  Rather, WIN and Mr. Radano had a concurrent fiduciary duty to the firm's clients to disclose material information.  Given that the

---

[3]  The professional money managers who had discretionary authority to trade in the client's account were investment companies governed by the Investment Company Act of 1940.

Court has concluded that WIN and Mr. Radano are subject to the parameters of the Advisers Act, the Court must now proceed to an analysis of the claims against Defendants.

      *B.*      *Section 203(f) of the Advisers Act*

The SEC alleges that the actions of Defendants WIN and Mr. Radano with respect to Mr. Bolla subsequent to the imposition of his bar constituted a fundamental violation of their duties under Section 203(f) of the Advisers Act, with WIN acting as the primary violator and Mr. Radano acting as an aider and abettor to the violation.  Section 203(f) makes it unlawful for any person who has been suspended or barred from being associated with an investment adviser, from willfully becoming or being associated with an investment adviser without the consent of the Commission.  *See* 15 U.S.C. § 80b-3(f).  This Section also makes it unlawful for any investment adviser to "permit such a [barred] person to become, or remain, a person associated with him without the consent of the Commission, if such investment adviser knew, or in the exercise of reasonable care, should have known such order." *Id.*  Section 202(a)(17) of the Advisers Act defines "person associated with an investment adviser" as "any partner, officer, or director of such investment adviser (or any persons performing similar functions), or any persons directly or indirectly controlling or controlled by such investment adviser, including any employee of such investment adviser . . . ." 15 U.S.C. § 80b-2(a)(17).  In order to establish a violation of Section 203(f), the SEC must establish by a preponderance of the evidence that WIN and Mr. Radano "permitted" Mr. Bolla to remain associated with the firm after he was barred by the SEC from acting as an investment adviser.  *Id.*; *Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91, 96, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981); *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978); *Sec. & Exch. Comm'n v. Moran*, 922 F. Supp. 867, 888

(S.D.N.Y. 1996).

To the consternation of this Court and the delight of lexicographers everywhere,[4] the Advisers Act does not define the term "permit" as it applies to the prohibitions detailed in Section 203(f).  "When there is no indication that Congress intended a specific legal meaning for the term, the court may look to sources such as dictionaries for a definition."  *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) (citing *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 1914-16, 141 L.Ed.2d 111 (1998) (relying upon dictionaries, literature, and newspaper reports, in addition to legislative history, to ascertain the meaning of the word "carry")).  Much like the typical "battle of the experts," the parties in this case have confronted the Court with a veritable "battle of the dictionaries."  Defendants, citing to WEBSTERS II NEW COLLEGE DICTIONARY (1995) at 819, emphasize the *active* requirement of "permit": "to consent to; to allow; to give permission to or for; to authorize; to afford opportunity to."  Defs.' Proposed Findings of Fact ¶ 60.  In contrast, the SEC focuses on a more *passive* definition of "permit," quoting the OXFORD ENGLISH DICTIONARY: "to allow, suffer, give leave; not to prevent."  Pl.'s Proposed Findings of Fact at 12.  For the sake of completeness, the Court notes that BLACK'S LAW DICTIONARY (7th ed. 1999) at 1160, defines "permit" as "[t]o consent to formally; [t]o give opportunity for <lax security permitted the escape>; "[t]o allow or admit of"; MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1997) at 866, defines "permit" as "to consent to expressly or formally; to give leave: authorize; to make possible: to give opportunity: to allow";

---

[4] Samuel Johnson, in his DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1755), famously defined a "lexicographer" as "[a] writer of dictionaries; a harmless drudge that busies himself in tracing the original, and detailing the signification of words."  Unfortunately for the purposes of Section 203(f), there is nothing necessarily "harmless" in the active v. passive distinction of "permit."

and THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1997) at 1018, defines "permit" as "[t]o allow the doing of (something); consent to; [t]o grant leave or consent to (someone); authorize; [t]o afford opportunity or possibility for."

Regardless of whether Congress intended to emphasize the "active" or "passive" nature of "permit" for the purposes of Section 203(f), Defendants contend "far from 'permitting' Bolla to remain associated with WIN, it is undisputed that Robert Radano took affirmative action to notify Lockwood of the bar." Defs.' Proposed Findings of Fact ¶ 61. According to Defendants, "[n]othing could be more antithetical to the notion that WIN 'permitted' Bolla's continued association than the fact that Mr. Radano, acting on behalf of WIN, informed the one entity that made Bolla's 'advisory' work possible – Lockwood." *Id.* Defendants further stress that the SEC's claim that Mr. Radano's goal was to permit Mr. Bolla "to remain associated with the firm after his bar," Pl.'s Proposed Findings of Fact ¶ 13, and to "manage WIN's finances," *id.* ¶ 14, defies logic; rather, given Mr. Radano's affirmative decision to contact Lockwood and notify them of the bar – of which it would not have been aware of otherwise – and his repeated protests of Lockwood's continued disbursements to Mr. Bolla after it had knowledge of his bar, Defendants claim that "[t]he facts simply do not square with the SEC's theory." Defs.' Response to Pl.'s Proposed Findings of Fact at 8.

In response, the SEC objects to Defendants' attempt to shift blame for their actions to an uncharged third-party – Lockwood. In contrast, the SEC asserts that "[i]t is, however, WIN's clients, not Lockwood, that made Bolla's advisory work possible." Pl.'s Response to Defs.' Proposed Findings of Fact at 11. According to the SEC, "Radano permitted Bolla to associate with WIN in violation of his bar by creating and perpetuating a nominee structure that hid Bolla's

ownership of WIN and by failing to inform WIN's clients that Bolla was continuing to associate with WIN." *Id.* Despite knowledge that Mr. Bolla was continuing to receive WIN's advisory fees from Lockwood, manage certain clients, and serve as the point of contact, the SEC contends that Mr. "Radano failed to take the action necessary to ensure that Bolla cease his advisory work: informing all of WIN's clients of Bolla's bar and injunctions and that Bolla was continuing to manage the WIN advisory fees that their accounts generated in violation o those sanctions." *Id.* at 11-12.

Upon a review of the record, the testimony presented during the three-day bench trial before this Court, and drawing all reasonable inferences therefrom, the Court concludes that the SEC has proved by a preponderance of the evidence that Defendants failed to meet their obligations under Section 203(f). Rather, WIN and Mr. Radano actively and passively permitted Mr. Bolla to remain associated with WIN despite knowledge of the imposition of a bar by the SEC preventing him from acting as an investment adviser. Importantly, Mr. Radano is a highly intelligent, savy individual with roughly fifteen (15) years of experience in the securities industry at the time of the events in question. In addition to being a Series 7 broker-dealer, he is also a Series 65 investment adviser. By the time that he met with Mr. Bolla in early 1997 to form WIN as a vehicle for their engagement with Lockwood, Mr. Radano knew that the SEC was investigating Mr. Bolla's conduct with respect to another investment advisory firm, Trustcap. Messrs. Radano and Bolla believed that the SEC's investigation into Trustcap would lead, in all likelihood, to the SEC barring Mr. Bolla from being associated with any investment adviser. Despite knowledge of these issues surrounding Mr. Bolla, Mr. Radano agreed to form a vehicle for his planned investment adviser services with Mr. Bolla. However, because Mr. Radano and

33

Mr. Bolla were concerned about potential SEC action against Mr. Bolla relating to the Trustcap matter, they agreed not to name Steven Bolla as an owner of WIN. Instead, at the time of the company's formation, they decided to make Mr. Radano and *Mrs. Bolla* the nominal owners of WIN – omitting Mr. Bolla entirely. WIN was established as a front for Mr. Bolla to continue to operate with his wife as a mere nominee to officially mask his true interest and control.

At that time, Mrs. Bolla admittedly had no experience in the securities industry. During the time period relevant to this case, Mrs. Bolla never acted as an investment adviser, nor did she ever discuss any substantive issues with WIN clients. Moreover, as she testified, she had no responsibility for filing and keeping track of WIN paperwork, handling any of WIN's finances, or working on internal accounting, despite the fact that she was technically a co-owner of WIN. Indeed, Mrs. Bolla also noted that she had never seen the monthly reports from Lockwood, or any checks coming to WIN. Mr. Bolla, in contrast, was a principal – if not *the* principal – of WIN in anything but name. Throughout the life span of WIN, Mr. Bolla referred roughly $30-$40 million in client assets to Lockwood, earning him approximately $150,000 a year in consultant fees from Lockwood. Moreover, Mr. Bolla essentially controlled WIN's finances, setting up an account at PNC Bank in the name of "Steve M. Bolla d/b/a/ Washington Investment Network," over which he had the sole control and signatory authority, and from which he made small disbursements to Mr. Radano. Mr. Bolla controlled all originals and copies of the fee payment checks sent by Lockwood to Mr. Bolla, and Mr. Radano never saw the monthly client account statements for the clients Mr. Bolla had referred to Lockwood.

Importantly, Mr. Radano knowingly consented to this structure. Despite knowledge of Mr. Bolla's impending problems, he helped to create a business structure that hid the true interest

of Mr. Bolla in the venture, and agreed to a system that allowed Mr. Bolla virtually unlimited

control of the firm's finances.  While certainly the junior partner in this relationship, given the

disparity in the fees garnered, Mr. Radano had the choice (1) not to involve himself with Mr.

Bolla, (2) not set up WIN in such a manner, (3) not to consent to Mr. Bolla's financial control,

(4) to withdraw from WIN once Mr. Bolla informed him of the impending bar, and (5) to

withdraw from WIN once the bar was actually imposed.

The expectation that the SEC would bar Mr. Bolla from associating with any investment

adviser as a result of the Trustcap investigation was ultimately fulfilled in 2000.   In January or

February 2000, Mr. Bolla told Mr. Radano that the SEC had decided to bar him, and on March

20, 2000, as part of a settlement with the SEC in the Trustcap matter, Mr. Bolla signed his

consent to the imposition of the bar.  After a June 19, 2000 Order by the Hon. Thomas Flannery

of the United States District Court for the District of Columbia issuing a judgment enjoining Mr.

Bolla from violating the anti-fraud and other provisions of the Investment Advisers Act of 1940,

the Securities Act of 1933, and the Securities Exchange Act of 1934, and imposing on him a

$10,000 penalty, the SEC issued an Order barring Mr. Bolla from associating with any

investment adviser, with the right to reapply for association after five (5) years from the date of

entry on June 20, 2000.

There is virtually no evidence that Mr. Radano, after being informed in early 2000 of Mr.

Bolla's upcoming bar, took any action to prepare for the imposition of that bar before June 20,

2000.  Mr. Radano had nearly six (6) months between the time he was first informed of Mr.

Bolla's upcoming bar and the actual imposition of that bar.  Rather than act then to dissolve WIN

and extricate himself from an association with a barred individual in advance of the actual

imposition, Mr. Radano refused to dissolve the business entity (WIN) and remained in a structure in which he (1) technically shared co-ownership with Mr. Bolla's wife and (2) actually shared fees with Mr. Bolla himself.  Indeed, when he visited the Bollas immediately prior to their move to Georgia, Mr. Radano obtained files relating to *his* clients, but did not obtain contact information or materials relating to Mr. Bolla's WIN clients – despite knowledge of the impending bar.

While Mr. Radano certainly contacted Lockwood in the period immediately following Mr. Bolla's June 20, 2000 bar, the weight of the evidence shows that Mr. Radano continued the WIN structure with Mrs. Bolla as nominally co-owner.  While Mr. Radano claims to have sent Mrs. Bolla a June 20, 2000 memorandum dissolving the structure, (1) the only evidence provided by Mr. Radano supporting the transmission of the alleged July 10, 2000 agreement was a June 12, 2001 facsimile header reflecting that Mr. Radano had sent the memorandum to the Bolla's new home in Georgia; and (2) Mrs. Bolla testified that she had not seen this memorandum until June 2001; and (3) despite knowledge of Mr. Bolla's impending bar, Mr. Radano registered Mrs. Bolla as a WIN investment adviser in the State of Connecticut in March 2000 <u>and</u> renewed her registration in Connecticut as a WIN investment adviser for the 2001 calendar year in December 2000; (4) in February 2001, Mr. Radano wrote a check payable to Mrs. Bolla for $2,770 from client fees generated in the first quarter of 2001; and (5) Mr. Radano admittedly told staff in April 2001 from the SEC's Office of Compliance Inspections and Examinations that Mrs. Bolla was a current owner of WIN.  Based on the evidence presented at trial and the record provided, the Court finds that Mr. Radano did not act to formally dissolve WIN's connection to Mrs. Bolla – and therefore Mr. Bolla – until he himself began having problems with the SEC in the Summer

of 2001.

During the months following the imposition of Mr. Bolla's bar, Mr. Radano as the "remaining" principal of WIN was aware that Mr. Bolla continued to receive advisory fee checks payable to WIN from Lockwood and MLM.  Mr. Radano knew that Mr. Bolla continued to manage WIN's finances, and – while he requested that Mr. Bolla provide him the checkbook for the account and demanded that Lockwood cease its payments to Mr. Bolla – Mr. Radano could certainly have taken additional steps to prevent Mr. Bolla's continued financial control of a company that Mr. Radano owned, not Mr. Bolla.  Mr. Radano was aware that Mr. Bolla was continuing to act as an investment adviser during this period to some WIN clients, such as Nancy DeFelice and David Meredith.  Mr. Radano also knew that Mr. Bolla was continuing to serve as the point of contact for other WIN clients, and – after speaking with Mr. Bolla on the phone – followed Mr. Bolla's instructions and gladly accepted certain client referrals.  Despite knowledge of Mr. Bolla's actions, taken in WIN's name, and Lockwood's apparent dilatoriness, Mr. Radano took no steps to inform the SEC or any other agency of the possible violations.  Rather, Mr. Radano chose to ratify his continued relationship with the Bollas by providing Mrs. Bolla a check for approximately $2700 – after a conversation with Mr. Bolla – for what Mr. Bolla deemed he was owed by WIN in the form of the moving expenses and some administrative fees.  According to Mr. Bolla, "I built a company on behalf of WIN.  I mean, whether that was on behalf of WIN, I think that WIN owed *me* that."  Bolla Dep. at 68:12-14 (emphasis added).

Ultimately, Mr. Radano's conscious actions and omissions "permitted" Mr. Bolla to continue his association with WIN after the imposition of his bar.  Mr. Radano was involved in setting up WIN as an entity wherein Mr. Bolla's control was hidden behind a nominee co-owner,

37

and where Mr. Bolla had virtually limitless control over the firm's finances. Despite being informed months in advance of Mr. Bolla's upcoming bar, Mr. Radano chose not to dissolve WIN or remove his interest from the entity. As such, Mr. Radano did not take adequate measures to prevent Mr. Bolla's continued association. Rather than taking his clients with him and dissolving WIN, Mr. Radano maintained a business association with Mr. Bolla through WIN in the hopes of obtaining some of his valuable book of clients. While Mr. Radano took some steps to formally sever Mr. Bolla's ties with Lockwood, he failed to prevent Mr. Bolla's continued association with his firm, WIN, and actively continued (1) to follow Mr. Bolla's instructions with regard to third-party payments, (2) to accept Mr. Bolla as the point of contact and as a source of referrals, (3) to pay the Bollas certain fees initially paid to WIN upon direction of Mr. Bolla, and (4) to perpetuate a structure in which Mrs. Bolla was the nominal co-owner of WIN. Mr. Radano did not inform the SEC of Mr. Bolla's continued involvement, and did not inform all of WIN's clients of Mr. Bolla's bar and the impropriety of his continued association. Despite his intelligence and experience in the securities industry, Mr. Radano chose the lure of continued business with Lockwood and potential profit from Mr. Bolla's book of clients over his obligations under Section 203(f). Given that Mr. Radano failed – both actively and passively – to prevent Mr. Bolla from continuing his association with both WIN and himself after he had full knowledge of Mr. Bolla's bar, the Court concludes that the SEC has established by a preponderance of the evidence that WIN and Mr. Radano violated Section 203(f) of the Advisers Act.

   C.    *Sections 206(1) and 206(2) of the Advisers Act*

   In addition to a violation of Section 203(f), the SEC alleges that Defendants contravened

the requirements of Sections 206(1) and 206(2) of the Advisers Act, with WIN acting as a

primary violator and Mr. Radano acting as an aider and abettor to the violation.  "Sections 206 of

the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the

benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with

clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients."

*Moran*, 922 F. Supp. at 895-96 (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S.

11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *Burks v. Lasker*, 441 U.S. 471, 482 n.10, 99

S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 n.11, 97

S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Capital Gains Research Bureau*, 375 U.S. at 191-92, 84

S.Ct. 275)).  In relevant part, Section 206 of the Advisers Act provides:

> It shall be unlawful for any investment adviser, by use of the mails or any means
> or instrumentality of interstate commerce, directly or indirectly –
> (1) to employ any device, scheme, or artifice to defraud any client or prospective
> client;
> (2) to engage in any transaction, practice, or course of business which operates as
> a fraud or deceit upon any client or prospective client.

15 U.S.C. §§ 80b-6(1) and (2).  As such, Sections 206(1) and 206(2) impose a fiduciary duty

upon investment advisers to disclose material facts to their clients.  *Capital Gains Research*

*Bureau*, 375 U.S. at 194, 84 S.Ct. 375.  A fact is material if, after "tak[ing] into consideration the

'total mix' of available information," *Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622, 626

(D.D.C. 1991), "there is a substantial likelihood that a reasonable shareholder would consider it

important," *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757

(1976); *see also Basic v. Levinson*, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

The SEC has the burden of proof on each claim, and must prove each element of Section 206(1)

and 206(2) by a preponderance of the evidence.  *See Steadman*, 450 U.S. at 96, 101 S.Ct. 999; *Savoy Indus.*, 587 F.2d at 1169; *Moran*, 922 F. Supp. at 888.

    1.    <u>Section 206(1)</u>

Section 206(1) is a traditional anti-fraud provision and requires proof of scienter in order to establish a violation.  *See Steadman v. Sec. & Exch. Comm'n*, 603 F.2d 1126, 1134 (5th Cir. 1979); *Sec. & Exch. Comm'n v. Batterman*, Civ. No. 00-4835 (LAP), 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002); *In the Matter of Jamison, Eaton & Wood, Inc.*, Investment Advisers Act Release No. 2129, 2003 WL 21099127, at *3-*4 (May 15, 2003).  It therefore follows that in order to successfully litigate a claim under Section 206(1), the SEC must prove that Defendants acted with scienter, i.e., an "intent to deceive, manipulate, or defraud."  *Sec. & Exch. Comm'n v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992).  In *Steadman*, the D.C. Circuit determined that "extreme recklessness may also satisfy this intent requirement."  *Id.* (joining the 5th, 9th, and 11th Circuits in making this finding).  However, the kind of recklessness required "is not merely a heightened form of ordinary negligence; it is an 'extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the action must have been aware of it.'"  *Id.* at 641-42 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (citation omitted), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977)).  "In other words, it is 'a lesser form of intent.'"  *Id.* at 642 (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)).

    2.    <u>Section 206(2)</u>

In contrast to Section 206(1), a simple finding of negligence will satisfy a finding of

liability under Section 206(2). *See Steadman*, 967 F.2d at 643; *Sec. & Exch. Comm'n v. Wall Street Publ'g Inst., Inc.*, 591 F. Supp. 1070, 1083 (D.D.C. 1984). Moreover, "[u]nlike § 10(b) of the 1934 Act, and even § 206(1), § 206(2) is more than an anti-fraud provision because it establishes fiduciary duties for investment advisers." *Morris v. Wachovia Secs., Inc.*, 277 F. Supp. 2d 622, 644 (E.D.Va. 2003). Under Section 206(2), Congress created "a fiduciary duty on the part of investment advisers to exercise good faith and fully and fairly disclose all material facts to their clients, and an affirmative obligation 'to employ reasonable care to avoid misleading [their] clients.'" *Id.* (quoting *Capital Gains Research Bureau*, 375 U.S. at 194, 84 S.Ct. 275). As such, in order to establish a violation of Section 206(2), the SEC is not required to show "intent and actual injury to clients" as required by Section 10(b). *Id.* Rather, the SEC must prove by a preponderance of the evidence that: (1) Defendants are investment advisers; (2) Defendants used the mails or any other means or instrumentality of interstate commerce, directly or indirectly (3) to make a misstatement or omission of material fact to a client or prospective client; and (4) Defendants acted negligently. *Capital Gains Research Bureau*, 375 U.S. at 191-92, 84 S.Ct. 275; *Sec. & Exch. Comm'n v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985); *Batterman*, 2002 WL 31190171, at *8; *Wall Street Publ'g Inst.*, 591 F. Supp. at 1083.

     3.   <u>Analysis</u>

An examination of the record provided and evidence adduced at the trial indicates that the material misstatements and omissions of Defendants Robert Radano and WIN violated Sections 206(1) and 206(2) of the Advisers Act. An analysis of WIN's and Mr. Radano's actions under the relevant four-part test for each section is in order.

     a.   *Acting as Investment Advisers*

As noted *supra* Section II(A), the Court has concluded that Mr. Radano and WIN are investment advisers, and were acting as investment advisers during the relevant time period.  As such, the SEC has met the first prong of the relevant test under Sections 206(1) and 206(2).

   b.  *Use of the Mails or Other Interstate Commerce Instrumentality*

In making the alleged misstatement or omission of a material fact, Mr. Radano used the mails or other instrumentality of interstate commerce.  Where a statute requires that the defendant use the mails or instrumentalities of interstate commerce, the plaintiff or prosecution must actually present evidence at trial to prove this element.  *See United States v. Altman*, 48 F.3d 96, 103-04 (2d Cir. 1995); *United States v. Massey*, 827 F.2d 995, 999 (5th Cir. 1987).  Defendants contend that "[h]ere, the SEC presented no evidence of a use of the mails or instrumentalities of interstate commerce, circumstantial or otherwise."  Defs.' Response to Pl.'s Proposed Findings of Fact at 9-10.  Contrary to Defendants' assertion, the SEC presented substantial evidence indicating that Mr. Radano spoke with roughly a dozen clients referred to him by Mr. Bolla, wherein he allegedly failed to make the necessary disclosures, and it is undisputed that Mr. Radano spoke telephonically with both Karen Grotto and Nancy DeFelice, wherein he also allegedly failed to make the required disclosures.  As such, the SEC clearly met its basic jurisdictional requirement by proving that Mr. Radano used the telephone wires, an instrumentality of interstate commerce, in his failure to disclose Mr. Bolla's disciplinary history to WIN's clients.

   c.  *Misstatements or Omissions of Material Fact to Clients*

Upon a review of the record provided and evidence adduced at trial, the Court concludes that Mr. Radano made material misstatements or omissions of a material fact on behalf of WIN

to actual WIN clients and prospective clients for which he personally was seeking to be named investment adviser.  To meet this prong, the SEC must establish that (1) the information in question was material, (2) Defendants had a duty to disclose the information, and (3) Defendants either omitted the information or misstated the information when making a disclosure.  *See Steadman*, 603 F.2d at 1130; *Capital Gains Research Bureau*, 375 U.S. at 200-01, 84 S.Ct. 275; *Wall St. Publ'g Inst.*, 591 F. Supp. at 1083.

 <u>First</u>, the information at issue – the fact that Mr. Bolla had been barred, enjoined, and fined by the SEC, and could no longer act as an investment adviser for WIN – was clearly "material."  *See Sec. & Exch. Comm'n v. Suter*, Civ. No. 81-3865, 1983 U.S. Dist. LEXIS 19303, at *7-*8, *31 (N.D.Ill. Feb. 11, 1983), *aff'd*, 732 F.2d 1294 (7th Cir. 1984).  In an effort to escape this fact, Defendants claim that "[t]he only client assigned to Radano by Lockwood who the SEC alleges was deceived was Nancy DeFelice."  Defs.' Proposed Findings of Fact ¶ 80. However, Defendants note that when Ms. DeFelice spoke with Mr. Radano, she already knew of Mr. Bolla's bar, having been told of it by the SEC.  As such, Defendants assert that "[t]he law is clear that a person cannot be deceived or defrauded if they already know the information that the other party allegedly failed to reveal."  *Id.* (citing *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126; *Fleck*, 763 F.Supp. at 626; *Chelsea Assocs. v. Rapanos*, 376 F. Supp. 929, 940 (E.D.Mich. 1974)).  As such, Defendants contend that the SEC cannot meet the materiality requirement.  *Id.*; *see also* Defs.' Response to Pl.'s Proposed Findings of Fact at 9-10.

 Defendants' assertions are fundamentally without merit for several reasons.  First, Defendants's attempt to narrow the relevant activity to "[t]he only client assigned to Radano by Lockwood" flies in the face of the reality of Mr. Radano's actions and the scope of Section 206.

Importantly, Section 206(1) and (2) both cover "any client or prospective client."  *See* 15 U.S.C.

§ 80b-6(1) and (2).  As such, Defendants are improperly limiting the scope of Mr. Radano's

actions to clients assigned by Lockwood, when all WIN clients or potential clients are the

relevant subset.  When considered in that context, it is clear that Mr. Radano also allegedly made

material misstatements or omissions to the dozen or so WIN clients referred to by Mr. Bolla, and

to Ms. Grotto as well – none of whom knew in advance that Mr. Bolla had been barred from

acting as an investment adviser by the SEC.  Second, the cases cited by Defendants are

inapplicable to the situation at hand.  None of the three cases identified by Defendants deal with

the situation at hand – an alleged violation of Section 206.  Instead, they concern alleged

violations of Rule 10b-5 and 14a-9.  As such, different policy considerations come into play: if a

public company omits or misstates a material fact but the public – in advance – knows the truth,

the market should not be affected, and the share price should not be altered.  Accordingly, the

law is somewhat forgiving because it is assumed that the information at issue is already reflected

in the share price, and therefore it has been held that "[t]here is no duty to disclose information to

one who reasonably should already be aware of it."  *Chelsea Assocs.*, 376 F. Supp. at 940 (citing

cases).

In this case, the Court is faced with information of which the investors with WIN should

and would *not* have been reasonably aware.  Barring contact from Mr. Radano, Mr. Bolla,

Lockwood, or the SEC, there is simply no way that they would have learned of Mr. Bolla's bar.

There is no "share price" that may have already absorbed the information and prevented further

harm.  Given the fiduciary duties owed by an investment adviser to his clients and the necessary

foundation of truth and ethical action underlying the relationship, to take up Defendants'

suggestion and allow an investment adviser to freely lie or omit information to his clients – as long as they know that he cannot be trusted – is to court the absurd and undermine the basis of Section 206.  As such, the Court considers the fact that Ms. DeFelice might have been aware of Mr. Bolla's bar in advance of her conversation with Mr. Radano in the Spring of 2001 to be entirely irrelevant for the purposes of Mr. Radano's liability.  In this case, a reasonable investor – given the "total mix" of the information at hand – would have considered the fact of Mr. Bolla's bar to be material and important to any further decisions regarding their investment future.

Second, Mr. Radano and WIN had a duty to disclose Mr. Bolla's bar to their clients and prospective clients under Section 206.  Here, Defendants once again seek to escape liability by shifting the blame to Lockwood.  Defendants contend that "the entity contractually obligated to these clients was Lockwood.  Lockwood acted as the SEC-registered investment adviser and broker-dealer of record: it held the client's funds, had the authority to make trades, and had the power to debit the clients' accounts."  Defs.' Proposed Findings of Fact ¶ 76.  Defendants assert that "Lockwood acknowledged it was the 'fiduciary . . . to the client' and that it was 'Lockwood's responsibility as fiduciary' to inform the clients of Bolla's bar, which of course it failed to do so."  *Id.* (citing Pl.'s Ex. 44).  In contrast, contend Defendants, "WIN and Mr. Radano had no such authority," *id.*, and "cannot be held liable for a material omission or failure to disclose because WIN – unlike Lockwood – had no duty of disclosure to Lockwood's clients." *Id.*

Defendants' contentions are unavailing for two reasons.  First, Mr. Radano and WIN were investment advisers earning compensation from these clients.  The clients at issue were WIN clients as well as clients of Lockwood.  Concurrent duties and fiduciary obligations flowed from

both entities.  The individual investors at issue trusted Mr. Bolla and Mr. Radano to connect

them with effective money managers and to keep an eye on their accounts once they were

forwarded on to Lockwood.  Their clients thought of them and WIN as their "investment

adviser," and – as seen in the case of Ms. DeFelice – were certainly shocked and concerned about

any alteration of that relationship.  While some of the clients of WIN at issue might be

characterized as Mr. Bolla's "clients" rather than Mr. Radano's clients, such as Ms. Grotto and

Ms. DeFelice, many of the individuals to whom Mr. Radano allegedly withheld or misstated the

fact of Mr. Bolla's bar were "prospective clients" of Mr. Radano, whose goal it was to retain a

portion of Mr. Bolla's valuable book.  As such, Mr. Radano's obligations under Section 206

were triggered vis-á-vis these individuals as well.

Moreover, even assuming *arguendo* that Defendants' theory has some validity, and that

only Lockwood owed a duty of disclosure of Mr. Bolla's bar to the clients at issue, it has long

been established that "[w]hen a corporation does make a disclosure – whether it be voluntary or

required – there is a duty to make it complete and accurate."  *Roeder v. Alpha Indus., Inc.*, 814

F.2d 22,25 (1st Cir. 1987); *see also Jaroslawicz v. Engelhard Corp.*, 704 F. Supp. 1296, 1299

(D.N.J. 1989) ("the making of an affirmative statement on a securities matter triggers a duty to

include such information as would prevent the statements from misleading a reasonable

investor"); *Grossman v. Waste Mgmt., Inc.*, 589 F. Supp. 395, 409 (N.D.Ill. 1984) ("[i]f . . . a

company chooses to reveal relevant, material information even though it has no duty to do so, it

must disclose the whole truth").  Moreover, "a duty to disclose also arises where a corporation

has previously made a statement of material fact that is either false, inaccurate, incomplete, or

misleading in light of the undisclosed information."  *Simon v. Am. Power Conversion Corp.*, 945

F. Supp. 416, 424 (D.R.I. 1996) (citing *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996)).  Accordingly, even under Defendants' theory, once Mr. Radano began discussing the whereabouts of Mr. Bolla with WIN clients and prospective clients, he triggered an affirmative obligation to truthfully and accurately represent why Mr. Bolla had "left" WIN.  Because the SEC has provided evidence indicating that Mr. Radano often said that Mr. Bolla was "out of the office," i.e., in the case of Ms. Grotto, or simply that he had left WIN and was "pursu[ing] more of the insurance angle of the business," i.e., in the case of Ms. DeFelice, he triggered an obligation to be entirely truthful on all material information relating to Mr. Bolla with these clients or prospective clients for the purposes of Section 206.  Accordingly, even if somehow he had no initial duty to inform WIN's clients of Mr. Bolla's bar despite the fact that he was connected with WIN as an investment adviser and they were either his clients or prospective clients, his affirmative representations to certain clients triggered such a duty.  Given this fact, the Court concludes that the SEC has established that Mr. Radano had a duty to inform his clients or prospective clients of Mr. Bolla's bar in a truthful and accurate manner.

Third, based on the evidence adduced at trial and the record presented, the Court concludes that Mr. Radano breached his duty to inform his clients and prospective clients of Mr. Bolla's bar.  Indeed, the evidence shows that Mr. Radano affirmatively misled both Ms. Grotto and Ms. DeFelice regarding Mr. Bolla.  In her deposition, Mr. Grotto credibly testified that in October 2000, she had a conversation with Mr. Radano regarding Mr. Bolla.  Grotto Dep. at 43:9-44:3 (noting that the conversation was after October 2000 but before Mr. Radano's name appeared in the place of Mr. Bolla's on her statement).  During this discussion, Mr. Grotto testified that Mr. Radano initially led her to believe that Mr. Bolla was simply not available to

talk because he "was out.  He was out of the office."  *Id.* at 32:5-12.  However, Mr. Radano then

simply informed Ms. Grotto that "'he's [Mr. Bolla] moved on,'" but did not tell her where Mr.

Bolla had moved.  *Id.* at 44:4-11.  At no point during the course of Ms. Grotto's conversations

with Mr. Radano did he ever mention that Mr. Bolla had been barred by the SEC from acting as

an investment adviser.  *Id.* at 31:24-32:12.

Ms. DeFelice had a similar conversation with Mr. Radano in the Spring of 2001.

According to Mr. DeFelice, during this conversation, Mr. Radano did not affirmatively notify her

of Mr. Bolla's bar, despite the fact it was her understanding that Mr. Bolla was still her

investment adviser at WIN.  Rather, Mr. Radano simply informed her that "Steve was going to

pursue more of the insurance angle of the business."  Trial Tr. at 63:3-6, 63:7-10.  Once she

confronted Mr. Radano with the fact that Mr. Bolla had been barred, Mr. Radano simply told her

that "a company in California had gone bankrupt and that Steve had information around that

company and that the SEC was investigating, and that WIN was not under investigation."  Trial

Tr. at 63:11-17, 64:15-19 (Mr. Radano gave her the impression "Yeah, it's not a big deal.  We're

not under investigation.").  Mr. Radano, in his testimony, basically echoes Ms. DeFelice's

version of events, wherein he claimed that he "went into my 'Steve had a problem with another

firm.  It's unrelated to your situation here.  And he's no longer with WIN.  He's working with a

firm in California.'  I went into the basic lines."  *Id.* at 435:15-19.  According to Ms. DeFelice,

she felt she was "pressing for this information" with Mr. Radano and it "was not given

voluntarily to me," *id.* at 88:10-14; in the end, Ms. DeFelice noted that Mr. Radano ultimately

"offered to help me and told me I didn't need a lawyer.  And that was basically it," *id.* at 63:11-

17.  As noted previously, the Court credits the testimony of Ms. Grotto and Ms. DeFelice to the

extent that any conflict exists with the testimony of Mr. Radano.

Here, Mr. Radano had an affirmative fiduciary duty as a principal of the firm – WIN – to provide WIN's actual clients complete, truthful, and accurate information concerning one of the other main principals of the firm.  Moreover, each of these individuals was also a "prospective client" vis-á-vis Mr. Radano, as Mr. Radano admittedly hoped to receive some of Mr. Bolla's valuable book of clients and actually became (briefly) the Lockwood-named "investment adviser" for these two individuals.  Given that Ms. Grotto and Ms. DeFelice were "prospective clients," Mr. Radano also had a personal fiduciary duty under Section 206 to inform them of all material information relevant to WIN as an entity – including that Mr. Bolla had actually been barred by the SEC from acting further as an investment adviser.  Without providing this information, or omitting some material facts during his conversations, Mr. Radano was providing Ms. Grotto and Ms. DeFelice an inaccurate, skewed version of WIN as an investment adviser entity.

Simply put, and despite Defendants' protestations to the contrary, Mr. Radano was a fiduciary to these and similarly situated individuals.  Accordingly, he had an affirmative duty to inform them that Mr. Bolla, acting in the role of the major principal of WIN, had been barred by the SEC from acting as an investment adviser.  Statements noting that Mr. Bolla was "out of the office" or "had left the firm" or "was pursuing the insurance angle of the business" are simply insufficient and – without more – constitute material omissions.[5]  The mere fact that Mr. Bolla

---

[5] Defendants assert that "even if there was a duty of disclosure, in all [published] cases involving omissions or failure to disclose material information under the Act, there was some communication distributed to clients or prospective client."  Defs.' Proposed Findings of Fact ¶ 77.  Two problems exist with this claim.  First, Section 206 contains no explicit requirement that the omissions and misstatements in question be in some form of writing.  Rather, a plain reading

was no longer with WIN is significant, but not complete.  Mr. Bolla left because the SEC

obtained an anti-fraud injunction and bar against him.  There is a substantial difference between

telling an investor that a principal had "left the firm" and notifying them that the principal "has

been barred," even if the bar originated out of an unrelated matter.  Confronted with the fact that

his/her investment adviser had been barred, the reasonable investor would likely question the

firm, wondering whether the other investment advisers could also be trusted to fulfill their ethical

obligations.  The reasonable investor would be more likely to react like Ms. DeFelice and

withdraw his/her money entirely, rather than simply agreeing to an easy transfer of the account to

an investment adviser with the same firm.  By not informing WIN's clients and his prospective

clients of the full and complete reasons for Mr. Bolla's departure, Mr. Radano opted to pursue

the potential financial gain resulting from easy transfers of accounts over the hard

acknowledgment that his business partner had been barred from further practice by the regulating

agency.[6]  As such, the Court concludes that the SEC has established by a preponderance of the

evidence that (1) the information relating to Mr. Bolla's bar was material, (2) Mr. Radano – as a

---

of the text allows for SEC actions against verbal omissions and misstatements.  Second,
Defendants have identified no case, whether binding or merely persuasive, that limits the
construction of Section 206 in such a manner.

    [6] Defendants assert that "[t]he case law reveals that the situations in which a material
misrepresentation or omission disseminated to a client have been found actionable as fraud
usually entail a lack of disinterestedness or the presence of an economic motive on the part of the
liable investment adviser."  Defs.' Proposed Findings of Fact ¶ 83.  Taking Defendants' claim as
true, it is clear that an economic motive provided the impetus behind Mr. Radano's
nondisclosures and misstatements:  simply, he hoped to avoid mention of an SEC bar against Mr.
Bolla in order to avoid tarnishing the WIN "brand name," to assuage possible fears of WIN
investors, and to gain Mr. Bolla's valuable book of business for himself by simply moving these
clients from Mr. Bolla to himself while keeping them under the "WIN umbrella."  Mr. Radano
obviously wanted to "get clients *away* from Mr. Bolla," *id.*  ¶ 84, but he also wanted to gain the
clients for himself – a goal that could be facilitated by nondisclosure or half-truths.

co-owner and principal of WIN, as an investment adviser, and as a adviser to "potential clients" –

had an obligation to completely, accurately, and affirmatively disclose such information, and (3)

Mr. Radano breached his duty to disclose.

d.     *Negligence or Scienter?*

At the minimum, Mr. Radano's failure to inform WIN's clients and his prospective

clients of Mr. Bolla's bar was an action that the ordinary investment adviser would find to be a

negligent and unreasonable dereliction of his duties under the Advisers Act.  Simply, Mr. Radano

failed to exercise the ordinary care required of an investment adviser in meeting his obligations

under the Advisers Act and keeping his clients and prospective clients informed of all relevant,

material information.  Because Mr. Radano was negligent – at the very least – the Court

concludes that the SEC has established by a preponderance of the evidence that he and WIN

violated Section 206(2) of the Advisers Act.

As detailed previously, Section 206(1) requires "scienter" or "extreme recklessness" to

create liability.  *Steadman*, 967 F.2d at 641-42.  Defendants consistently focus on the fact that it

is undisputed that Mr. Radano informed Lockwood of Mr. Bolla's bar almost immediately, and

without that notification Lockwood would not have discovered the bar.  According to

Defendants, this is evidence of Mr. Radano's good faith intentions and his general concern for

WIN's clients.  *See* Defs.' Proposed Findings of Fact ¶ 91.  The Court concludes just the

opposite: Mr. Radano immediately notified Lockwood of Mr. Bolla's bar, and vehemently

protested its continued mailing of fees to Mr. Bolla, because it was in his economic interest to

separate Mr. Bolla from Lockwood as soon as possible.  In contrast, when faced with actual

phone calls with investors whose point of contact at WIN had previously been Mr. Bolla, Mr.

51

Radano was reticent and reserved in providing information about Mr. Bolla and did not disclose the bar. As Ms. DeFelice noted, investors had to press him for any information regarding Mr. Bolla, which was not volunteered willingly. The evidence presented at trial, and the reasonable inferences therefrom, indicate that Mr. Radano acted in this manner with these WIN clients in an effort to maintain their association with WIN by transferring their accounts to him.

Simply, at the time of Mr. Bolla's bar, Mr. Radano earned roughly $10,000 a year from his work with WIN, while Mr. Bolla earned roughly $150,000. Mr. Radano was well aware that he could potentially increase his salary fifteen-fold when and if Mr. Bolla ultimately complied with his bar, and if the clients that Mr. Bolla had introduced to WIN remained with the firm. As such, it was in his interest to (1) intervene and remove Mr. Bolla from the Lockwood relationship as soon as possible and (2) retain Mr. Bolla's clients at WIN by omitting or misstating information relating to Mr. Bolla's bar such that the investors would not be concerned about his judgment and the ethical soundness of WIN. Given the fact that Mr. Radano worked with Mr. Bolla to create a structure that allowed Mr. Bolla to associate with WIN as a nominee, took affirmative actions to perpetuate the structure even after he learned that Mr. Bolla would be barred, and conducted energetic discussions with Lockwood while engaging in conversations full of reticence and affirmative misrepresentations with certain clients, the Court concludes that the SEC has proven by a preponderance of the evidence that the material omissions and misstatements at issue in this case were intentional on the part of Mr. Radano. Mr. Radano's hope of retaining those clients that Mr. Bolla had introduced to WIN trumped his good judgment and his fiduciary duty to them. As such, because the SEC has established the necessary "scienter," the Court finds that the SEC has established by a preponderance of the evidence that

Mr. Radano and WIN are liable under Section 206(1) as well.

        D.      *The Need for Injunctive Relief and/or Civil Fines*

In an SEC enforcement action that does not seek to halt an ongoing violation, the test for issuing injunctive relief "is whether the defendant's past conduct indicates . . . that there is a *reasonable likelihood* of further violation(s) in the future." *Savoy Indus.*, 587 F.2d at 1168 (quoting *Sec. & Exch. Comm'n v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978) (emphasis in original), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979)). This test requires "'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Steadman*, 967 F.2d at 648 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed.2d 1303 (1953)). The D.C. Circuit has identified three factors to be applicable to determine the reasonable likelihood of a future violation: (1) whether a defendant's violation was isolated or part of a pattern; (2) whether a defendant's violation was flagrant and deliberate, or merely technical in nature; and (3) whether the defendant's business will present opportunities to violate the law in the future. *Id.*; *see also Sec. & Exch. Comm'n v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C. Cir. 1989) (noting that "no single factor is determinative"). As a general rule, "[i]njunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public." *Id.*

Upon an analysis of the record presented and evidence adduced at trial, the Court concludes that injunctions are warranted against WIN and Mr. Radano with respect to their violations of Sections 203(f), 206(1), and 206(2). Indeed, Defendants attempts to transfer all responsibility for Mr. Bolla's bar violations, his continued association with WIN, and the failure

to disclose his disciplinary history to WIN clients to Lockwood simply emphasizes that injunctions are necessary to protect WIN's current and potential clients from future violations.

With respect to Section 203(f), there is compelling evidence of a "reasonable likelihood of future violations in the future."  WIN and Mr. Radano's violations of Section 203(f) were flagrant and deliberate violations of the SEC's bar Order against Mr. Bolla.  By working with the Bollas to create a nominee ownership, despite knowledge of potential disciplinary action against Mr. Bolla, and representing to SEC examiners in April 2001 that Mrs. Bolla was currently an owner of WIN, it is apparent that Mr. Radano's misconduct shows a pattern of obfuscating both his and WIN's relationship with Mr. Bolla.  The evidence of this pattern is further strengthened by Mr. Radano's apparent fabrication of the June 10, 2000 memorandum to Mrs. Bolla, and the fact that he sent a check to Mrs. Bolla in February 2001 as disguised compensation for Mr. Bolla at Mr. Bolla's direction.  Moreover, given the nature of WIN's advisory business – in particular, offering to share advisory fees with third-parties who refer clients to WIN – will present opportunities to violate Section 203(f) in the future.  *See First City Fin. Corp.*, 890 F.2d at 1228.

An injunction is also required with respect Sections 206(1) and 206(2), as there is compelling evidence that Mr. Radano and WIN's violations of these provisions were flagrant, deliberate, and part of a pattern.  As investment advisers, WIN and Mr. Radano will often be faced with the need to disclose material information to their clients.  Here, WIN and Mr. Radano failed to do so, despite repeated contact with a series of clients.  Given the fact that trust and full disclosure provide the foundation for the investment adviser relationship, the efforts by WIN and Mr. Radano to shift blame, hide behind corporate structures, and minimize the vital, material information at issue is troubling.  As such, the Court concludes that, due to the willful conduct of

WIN and Mr. Radano and their continuing refusal to acknowledge the most basic fiduciary duties of an "investment adviser," an injunction in this area is warranted as well.

The SEC, in its Amended Trial Brief, also requests that this Court impose a civil money penalty against WIN of $275,000 for each violation of Sections 203(f), 206(1), and 206(2) of the Advisers Act.  *See* Pl.'s Am. Trial Brief at 9.  The SEC further requests that this Court impose a civil money penalty of $55,000 against Mr. Radano for each aiding and abetting violation of Sections 203(f), 206(1), and 206(2) of the Advisers Act.  *Id.*  Given that it is uncontested that no investor lost any money in this case as a result of the violations at issue, and the fact that Lockwood is no longer associated with Mr. Radano and WIN, the Court finds these requested fines to be excessive.  Rather, given the level of malfeasance, the overall injury, and potential danger to the investing public from actions such as those taken by Mr. Radano and WIN, the Court orders that a total civil money penalty fine of $15,000 be imposed against Mr. Radano, and a total civil money penalty fine of $50,000 be imposed against WIN.

### III: CONCLUSION

For the reasons set forth above, the Court finds that the SEC has established by a preponderance of the evidence that Defendants WIN and Robert Radano violated Sections 203(f), 206(1), and 206(2) of the Advisers Act.  As such, the Court shall issue injunctions barring Defendants from future violations of these provisions, and shall impose a civil money penalty fine of $15,000 against Mr. Radano and a civil money penalty fine of $50,000 against WIN.

Date:   September 22, 2005

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge